Andrew M. Calamari
Sanjay Wadhwa
Charles D. Riely
Dominick D. Barbieri
Attorneys for Plaintiff
U.S. SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-0124 (Barbieri)
Email: barbierid@sec.gov


UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : | 16-CV-_____ (___) |
| | : | |
| Plaintiff, | : | ECF CASE |
| | : | |
| -against- | : | |
| | : | |
| LOUIS MARTIN BLAZER III, | : | COMPLAINT |
| | : | |
| Defendant. | : | |

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against defendant Louis Martin Blazer III ("Blazer"), alleges as follows:

## SUMMARY

1.      This case concerns a fraudulent scheme executed by Blazer to surreptitiously take money from his clients to make unauthorized risky investments, to repay clients who lodged complaints concerning how their funds had been invested and sought a return of their money, or to fund investments made in the name of a Blazer-controlled entity. In total, Blazer took $2,350,000 from five clients in unauthorized transactions.

2.      Blazer is the founder, owner, and operator of Blazer Capital Management, LLC ("Blazer Capital"), a Pittsburgh, Pennsylvania-based personal services or "concierge" firm that targeted as clients professional athletes and other high net worth individuals.  In 2008, Blazer also founded an affiliated registered investment advisory firm, Blazer Investment Advisors, LLC ("Blazer Advisors"), to provide investment-related services to his clients.  In 2012, Blazer co-founded another registered investment advisory firm ("Investment Advisory Firm 1") and transitioned many of his clients to that firm from Blazer Advisors.

3.      Between 2010 and 2012, Blazer repeatedly took money from his clients to invest without authorization in two movie projects in which Blazer had a financial interest.  In 2010, Blazer agreed to raise money for two film projects, "Mafia the Movie" and "Sibling."  The production company for each project was a limited liability company ("LLC")—Sibling the Movie, LLC ("Sibling LLC") and Mafia the Movie, LLC ("Mafia LLC")—with the plan being that investors would purchase LLC interests in each.  Blazer initially planned to raise at least $1 million to finance these movie ventures.  Although Blazer convinced some of his clients to invest in the projects, he was unable to raise the full amount needed to complete production of the two films.  To compensate for the shortfall, Blazer simply took funds from client accounts over which he had control, and used the money to finance the films.

4.      In one instance, Blazer pitched a client who was then a professional athlete ("Client 1") about an investment in the film projects.  Client 1 refused to make the investment.  Despite that, Blazer took $550,000 from Client 1's account and purchased LLC interests in Mafia the Movie and Sibling.  To transfer the money out of Client 1's

account, Blazer drafted forged documents and submitted them to Client 1's brokerage firm to make it appear as if Client 1 had authorized the transfer.

5.      Blazer also made Ponzi-like payments by making unauthorized transfers out of one client's accounts to repay another client seeking a return of his money.  In 2012, after Client 1 discovered that Blazer had made the $550,000 investment in the film projects without Client 1's authorization, Client 1 demanded his money back from Blazer and threatened legal action if Blazer was unable to return the money.  To make Client 1 whole, Blazer took money without authorization from yet another client who was also a professional athlete ("Client 2").  Blazer forged Client 2's signature and used the forged documents to transfer $650,000 from Client 2's accounts without authorization.  Blazer used $550,000 of Client 2's money to repay Client 1 by structuring the transaction as if Client 2 had purchased Client 1's LLC interests in the two movie projects, and the remaining $100,000 to fund an investment in the name of Blazer Capital in a music venture.

6.      In 2013, Blazer also made false statements to the Commission's examination staff ("Exam Staff") in order to conceal his fraud.  During an inspection of Investment Advisory Firm 1, Exam Staff identified the suspicious transactions through Blazer Capital accounts involving Client 1 and Client 2.  When questioned about these transactions, Blazer told the Exam Staff that both clients had authorized the investments.  Blazer, in fact, concocted a story that he put Client 1 in touch with Client 2 regarding the movies, and the two clients negotiated their own deal.  Blazer then prepared written responses to questions from the Exam Staff, which incorporated those lies.  Blazer also manufactured fake documents in an attempt to create documentation for the supposed

transactions.  In fact, neither Client 1 nor Client 2 approved any transaction relating to the investment of their funds in any movie projects or music venture.

## VIOLATIONS

7.     Based on the conduct alleged in this Complaint, Blazer violated Sections 17(a)(1) and 17(a)(3) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77q(a)(1) and (3)], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)], and Sections 206(1) and 206(2) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. §§ 80b-6(1) and (2)].

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

8.     The Commission brings this action pursuant to the authority conferred upon it by Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)], Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)], and Section 209(d) of the Advisers Act [15 U.S.C. § 80b-9(d)].  The Commission seeks a permanent injunction against Blazer, enjoining him from engaging in the transactions, acts, practices, and courses of business alleged in this Complaint, and disgorgement of all funds taken for unauthorized investments or to repay other clients as set forth in this Complaint, together with prejudgment interest.  The Commission also seeks civil penalties against Blazer pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)], and Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)].  Finally, the Commission seeks any other relief the Court may deem just and appropriate.

## JURISDICTION AND VENUE

9.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331,

Sections 20(b), 20(d), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d) and

77v(a)], Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e),

and 78aa], and Sections 209(c) and 214(a) of the Advisers Act [15 U.S.C. §§ 80b-9(c)

and 80b-14(a)].

      10.     Venue lies in this District pursuant to 28 U.S.C. § 1391(b)(2), Section

22(a) of the Securities Act [15 U.S.C. § 77v(a)], Section 27 of the Exchange Act [15

U.S.C. § 78aa], and Section 214(a) of the Advisers Act [15 U.S.C. § 80b-14(a)].  Certain

of the acts, practices, transactions, and courses of business alleged in this Complaint

occurred within the Southern District of New York and were effected, directly or

indirectly, by making use of the means or instrumentalities of transportation or

communication in interstate commerce, or of the mails, or the facilities of a national

securities exchange.  For example, some of the unauthorized funds transferred passed

through accounts located in the Southern District of New York, as part of Blazer's

scheme.

## THE DEFENDANT

      11.     **Blazer**, age 45, resides in Clinton, Pennsylvania.  During the relevant time

period, Blazer founded and owned interests in various investment advisory firms,

including Investment Advisory Firm 1 and Blazer Advisors.  Blazer is not currently

registered as a broker with the Commission but has held Series 7 and 63 licenses while

employed at various broker-dealers or investment advisory firms.  Nor was he registered

as a broker during the time period relevant to this complaint.

## RELEVANT INDIVIDUALS AND ENTITIES

      12.     **Client 1** is a former professional athlete.  Client 1 became a client of

Blazer's in 2006, and later became a client of Blazer Capital, Blazer Advisors, and Investment Advisory Firm 1.

13.     **Client 2** is a current professional athlete.  Client 2 became a client of Blazer Capital in approximately March 2010, and later became a client of Investment Advisory Firm 1.

14.     **Blazer Capital** is a Pennsylvania limited liability company formed in May 2008 with its principal place of business in Pittsburgh, Pennsylvania.  Blazer Capital was registered with the Commission as an investment adviser from May 2008 to August 2008. Blazer is the majority owner of Blazer Capital.

15.     **Blazer Advisors** is a Pennsylvania limited liability company formed in April 2008 with its principal place of business in Pittsburgh, Pennsylvania.  Blazer Advisors was registered with the Commission as an investment adviser from May 2008 through September 2008 and February 23, 2010 through March 29, 2012.  Blazer was a majority owner of Blazer Advisors.  Blazer Advisors was a predecessor of Investment Advisory Firm 1.

16.     **Investment Advisory Firm 1** is a Pennsylvania limited liability company formed in September 2011 with its principal places of business during the relevant time period in Kingston, New Jersey and Pittsburgh, Pennsylvania.  Investment Advisory Firm 1 has been registered with the Commission as an investment adviser since January 2012. During the relevant time period, Blazer owned 41.5% of Investment Advisory Firm 1.  A New Jersey-based registered investment advisory firm ("Investment Advisory Firm 2") also owned 41.5% of Investment Advisory Firm 1.  In October 2013, Blazer surrendered his ownership interest in Investment Advisory Firm 1.

17.    **Mafia LLC** is a Pennsylvania limited liability company formed in October 2010 with its principal place of business in Pittsburgh, Pennsylvania. Mafia LLC was the corporate vehicle associated with the production of the film "Mafia."

18.    **Sibling LLC** is a Pennsylvania limited liability company formed in November 2010 with its principal place of business in Pittsburgh, Pennsylvania. Sibling LLC was the corporate vehicle associated with the production of the film "The Sibling" also known as "A Resurrection."

**FACTS**

A.    **The Blazer Entities**

19.    Blazer provided investment advisory services to clients directly and through a number of entities. In 2008, Blazer founded Blazer Advisors and Blazer Capital, both based in Pittsburgh, Pennsylvania. Blazer Capital described itself as a "premier" personal services advisory firm that specialized in catering to the needs of professional athletes, entertainers, and high net worth individuals and families. Blazer Capital performed such functions as paying clients' bills for them and managing other aspects of their personal lives and financial commitments, including assisting with paying their taxes, and developing and managing personal budgets.

20.    Blazer Advisors was an affiliated registered investment advisory firm that performed traditional investment management functions for certain Blazer Capital clients. For example, Blazer Advisors advised clients concerning investment opportunities in traditional investments like whole life insurance policies, as well as non-traditional investments such as those in movie projects or other business opportunities.

21.    In late 2011, Blazer participated in the formation of Investment Advisory

Firm 1, a joint venture with Investment Advisory Firm 2 in which Blazer held a minority interest, and transitioned his clients from Blazer Advisors to Investment Advisory Firm 1 around that time.  Investment Advisory Firm 1 was a registered investment adviser that, as of April 1, 2013, advised 21 clients and had over $15 million in assets under management on a discretionary basis.  The vast majority of Blazer's advisory clients at Blazer Advisors transitioned to become clients of Investment Advisory Firm 1.

**B.     Blazer's Agreement to Raise Money for the Movie Projects and the Money Taken from Clients Without Authorization**

22.     Blazer placed his interests ahead of his clients, causing their funds, through deceptive acts detailed herein, to be used without authorization for speculative investments in the movies or for Blazer's own investments, even when, in some instances, clients expressly declined to participate in the speculative investments.

23.     In or around 2009, Blazer agreed to raise funds for Mafia LLC.  Blazer agreed to solicit these funds after one of his business partners introduced him to two individuals, an actor (the "Actor") and a producer (the "Producer"), who were planning to produce Mafia the Movie.  At around the same time, Blazer also agreed to attempt to raise money for Sibling LLC, another movie project by the Producer.  Blazer, who held an interest in the managing member of Mafia LLC and Sibling LLC, had an indirect financial interest in the success of the movie ventures at the time that he was raising funds for the movie ventures.  In both cases, the clients who obtained the LLC interests would only make money if the production team was successful and the movie was profitable.

24.     Although Blazer hoped to be able to raise at least $1 million for the films, he was not able to raise the full amount and ultimately took funds from his clients without

their authorization to ensure that the movie projects went forward.

25.     For example, as part of his efforts to raise money for the movie projects, in or around fall 2010, Blazer approached Client 1 about investing in the projects. Client 1 stated to Blazer that he had no interest in such investments and turned Blazer down.

26.     Despite Client 1's refusal to invest in the film projects, from October 1 to December 29, 2010, Blazer caused five transfers totaling $450,000 to be made from Client 1's personal brokerage account to a bank account in Mafia LLC's name, without Client 1's knowledge or authorization. Blazer caused an additional $100,000 transfer from Client 1's personal brokerage account to a bank account in Sibling LLC's name. Blazer had access to Client 1's accounts by virtue of his role as Client 1's financial advisor. To effect the transfers, Blazer used a copy of Client 1's signature to create documents that convinced Client 1's brokerage firm that Client 1 had actually authorized the withdrawals.

27.     In 2012, when Client 1 discovered that Blazer had purchased interests in Mafia LLC and Sibling LLC, he demanded that Blazer return the funds improperly taken. Client 1 also took steps to end his advisory relationship with Blazer and his companies.

28.     After Blazer initially was unable to pay, Client 1 threatened to take legal action against Blazer unless he was repaid by November 2012.

29.     To pay back Client 1, Blazer took the assets of another advisory client, Client 2, without Client 2's authorization. By virtue of his advisory relationship, Blazer had access to a brokerage account and two bank accounts of Client 2. On November 20 and 21, 2012, Blazer used his access to the Client 2 accounts to cause three transfers of $200,000 each, totaling $600,000, from the accounts to a Blazer Capital account. In one

instance, Blazer had a durable power of attorney over Client 2's account.  In the other

two instances, Blazer forged Client 2's signature on documents authorizing the transfers.

Blazer then caused $550,000 to be wired from the Blazer Capital account to Client 1 by

structuring the transaction as if Client 2 had purchased Client 1's LLC interests in the two

movie projects, thus returning to Client 1 all funds owed to him by Blazer, and

transferred the remaining $50,000 to a country music management company.

30.     In January 2013, Blazer wired another $50,000 from Client 2's account to

the country music management company.  The $100,000 taken from Client 2's accounts

to invest in the music venture was entirely to fund Blazer Capital's investment deal with

the country music entity.  No benefit under the deal was to go to Client 2.

31.     Client 2 did not authorize the transfers from his accounts.  Client 2 never

authorized Blazer to make any investments on his behalf in Mafia LLC or Sibling LLC,

and did not agree to purchase Client 1's interests in the movies.  Client 2 also never

authorized any investment in any music venture .

32.     Client 2, in fact, did not become aware of the transfers until contacted by

the Exam Staff in late 2013.  After learning that these investments had been made, Client

2 terminated his relationship with Blazer in late 2013.

33.     In total, as part of Blazer's scheme to take client assets without approval

for speculative investments or, in some cases, investments directly or indirectly for the

benefit of Blazer or one of his entities, Blazer took $2,350,000 between October 1, 2010

and January 2013 from the five injured clients.  None of these clients approved the

transfers in question, the undisclosed investment in the film projects, or Blazer's

investment in the music industry.  Subsequently, Blazer at times made payments to these

clients in connection with the above unauthorized transfers, returning a total of
approximately $790,000 to the five injured clients.

**C.      Specific Fraudulent Conduct to Perpetuate and Mask the Fraud**

34.     In addition to forging signatures to cause transfers of funds relating to the
movie investments and making Ponzi-like transfers among investors, Blazer engaged in
other deceptive acts to hide his fraudulent scheme from his clients.  For example, Blazer
provided each of his clients with an electronic emoney account that identified the
investments Blazer made on their behalf.  When Blazer took client funds without
authorization, he did not populate the emoney accounts with the movie investments.
Thus, the information provided to the clients was inaccurate in that it did not disclose the
use of client funds to purchase LLC interests in the movie projects or any music venture.

**D.      Blazer's Lies to the Commission's Exam Staff**

35.     In July 2013, the Exam Staff commenced an inspection of Investment
Advisory Firm 1 and Investment Advisory Firm 2.  In the course of the examination, the
Exam Staff identified the suspicious transactions through Blazer Capital's accounts
involving Client 1 and Client 2.  When the Exam Staff confronted Blazer about them,
Blazer told a series of lies and produced false documents in an attempt to conceal his
conduct.

36.     In an interview with the Exam Staff, Blazer falsely claimed that Client 2
had authorized the transfer of funds to Client 1.  After the interview, Blazer worked with
Investment Advisory Firm 1's chief compliance officer ("CCO") to prepare a written
submission.  Although it was ultimately signed by the CCO, the letter was drafted by
Blazer.  The letter submitted to the Exam Staff falsely stated that Client 1 and Client 2

authorized the transaction, and provided a false narrative of what led to the transaction between Client 1 and Client 2. The letter claimed, among other things, that in 2012, Client 1 "was seeking to create liquidity for several of his projects and decided to sell his investment in two films (Mafia and The Sibling)" and that Client 2 "agreed to purchase Client 1's interest in the two films for $550,000 paid via two separate wires through" Blazer Capital. The letter also claimed that Blazer and Client 2 had "discussed both the pros and cons of investing in alternative investments" and agreed that "this was a relatively small portion of his entire net worth so the risk of this investment to his overall net worth was not material." Finally, the letter also claimed that Client 2 agreed to invest $50,000 into the country music production company.

37.     Along with his oral and written misstatements, Blazer created a series of documents designed to mislead the Exam Staff into believing that his statements about the investments of Client 1 and then Client 2 in Mafia, Sibling, and the music venture were corroborated by contemporaneous documentation. These included unsigned purported deal documents memorializing Client 2's purchase of Client 1's interest in Mafia LLC and Sibling LLC. In addition, Blazer manufactured an unsigned agreement between Client 2 and the country music management company that tracked the form of the executed music venture agreement that Blazer funded from Client 2's account. Blazer merely took the agreement he executed with the music company, substituted Client 2 for himself, and provided the falsely created document to Exam Staff.

**FIRST CLAIM FOR RELIEF**

**Violation of Sections 17(a)(1) and 17(a)(3) of the Securities Act**

38.     The Commission realleges and incorporates by reference herein each and

every allegation contained in paragraphs 1 through 37.

39.     Blazer, singly or in concert, in the offer or sale of securities by the use of the means of instruments of transportation or communication in interstate commerce, knowingly or recklessly has employed devices, schemes, or artifices to defraud and/or engaged in acts, transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

40.     By reason of the foregoing, Blazer, directly or indirectly, singly or in concert, has violated, and unless enjoined will again violate, Section 17(a)(1) and Section 17(a)(3) of the Securities Act [15 U.SC. § 77q(a)(1) & (3)].

## SECOND CLAIM FOR RELIEF

**Violation of Section 10(b) and Rules 10b-5(a) and (c) of the Exchange Act**

41.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 37.

42.     Blazer, singly or in concert, directly or indirectly, in connection with the purchase or sale of securities by the use of the means of instruments of transportation or communication in interstate commerce, or of the mails or the facilities of a national securities exchange, knowingly or recklessly has employed devices, schemes or artifices to defraud and/or engaged in acts, transactions, practices, or course of business which operated or would operate as a fraud or deceit upon other persons.

43.     By reason of the foregoing, Blazer, directly or indirectly, singly or in concert, has violated, and unless enjoined will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a) and (c)].

## THIRD CLAIM FOR RELIEF

### Violation of Section 206(1) and 206(2) of the Advisers Act

44.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 37.

45.     Blazer is an investment adviser.  During the time period relevant to this Complaint, Blazer was associated with registered investment advisers whose clients, including the clients described herein, signed investment advisory agreements under which the investment advisers Blazer was associated with—Blazer Advisors and Investment Advisory Firm 1—were appointed as investment advisers in exchange for a fee.  Blazer was responsible for providing investment advice to the clients, did so, and was compensated for that advice.

46.     Blazer directly or indirectly, singly or in concert, knowingly or recklessly, through the use of the emails or any means or instrumentality of interstate commerce, while acting as an investment adviser within the meaning of Section 202(a)(11) of the Advisers Act [15 U.S.C. § 80b-2(a)(11)] has employed devices, schemes, and artifices to defraud any client or prospective client and/or engaged in acts, practices or course of business which operate as a fraud or deceit upon any client or prospective client.

47.     By reason of the foregoing, Blazer, directly or indirectly, singly or in concert, has violated, and unless enjoined, will continue to violate, Section 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1), 80b-6(2)].

14

## PRAYER FOR RELIEF

**WHEREFORE,** the Commission respectfully requests that this Court issue a Final Judgment:

### I.

Permanently restraining and enjoining Defendant, his agents, servants, employees, attorneys, and all persons in active concert or participation with them, who receive action notice of the injunction by personal service or otherwise, and each of them, from future violations of Sections 17(a)(1) and 17(a)(3) [15 U.S.C. §§ 77q(a)(1) and (a)(3)]; Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder [15 U.S.C. § 78j(b) & 17 C.F.R. § 240.10b-5(a) and (c)], and Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and 80b-6(2)];

### II.

Ordering Blazer to disgorge all of the ill-gotten gains from the violations alleged in this complaint, and ordering him to pay prejudgment interest thereon;

### III.

Ordering Blazer to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 78t(d)], Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)], and Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)]; and

### IV.

Granting such other and further relief that this Court deems just and proper.

Dated:      May 6, 2016
            New York, New York

                                    _____
                                    Andrew M. Calamari
                                    Sanjay Wadhwa
                                    Charles D. Riely
                                    Dominick D. Barbieri
                                    Attorneys for Plaintiff
                                    SECURITIES AND EXCHANGE
                                      COMMISSION
                                    New York Regional Office
                                    200 Vesey Street, Suite 400
                                    New York, New York 10281
                                    (212) 336-0124 (Barbieri)
                                    Email: barbierid@sec.gov